IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JEFFREY A. ERICKSON,

Petitioner, No. CIV S 03-2595 LKK CMK P

vs.

JULIO VALADEZ, et al.,

Respondent. FINDINGS AND RECOMMENDATIONS

______________________________/

Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 1997 conviction of second-degree murder and sentence of fifteen years to life. Petitioner claims that his constitutional rights were tainted by the trial court giving erroneous jury instructions. He further claims that his constitutional rights were violated when the California Court of Appeals reinstated his jury verdict and asserts that this court should reverse a California Supreme Court decision construing that state's murder statute.

I. Background

Petitioner was the driver in a fatal car accident, which occurred in the early morning hours of January 15, 1996. Harley Harmon was lying in bed reading when he heard what he believed to be a car traveling on Fruitvale road in front of his house; Harmon then

heard a loud "whump." Harmon was certain that he heard no braking noises prior to the "whump." After calling 911, Harmon approached the collision scene, where he saw petitioner in the wrecked car, trapped on the driver's side. Noticing that a fire had broken out in the car, Harmon tried to pull petitioner from the car; however, petitioner's foot appeared to be caught on something inside. Harmon finally yanked petitioner loose from the burning car. The entire vehicle burst into flames.

Petitioner, who was now only wearing one shoe, kept repeating that he had not been driving the car. Petitioner mentioned a friend in the car, but, by then, the car was engulfed in flames. Petitioner informed an emergency responder at the scene that he had been riding in the back seat of the vehicle and that he was not driving. The responder, who had looked at the wreckage, did not understand how petitioner had gotten out if someone else was driving. The responder noted that petitioner was wearing only one shoe and that petitioner smelled of alcohol.

Petitioner told a second emergency responder on the trip to the hospital that he could not remember the collision and was sleeping in the backseat before it occurred. He admitted to consuming two or three beers and several shots. During the trip to the hospital, petitioner answered several questions and appeared coherent.

The emergency room physician who treated petitioner at the hospital opined that petitioner was clearly intoxicated. Petitioner told the physician that he used alcohol daily and occasionally used marijuana and methamphetamine. According to petitioner, he had no recollection of the accident. Laboratory analysis of petitioner's blood and urine samples revealed that petitioner had been drinking. Experts for the prosecution testified that petitioner was impaired due to his use of alcohol and other illicit drugs.

Sheriff's Deputies responding to the accident observed the burnt remains of two people in the wreckage; one in the front passenger seat, and another person in the rear seat leaning forward. While inspecting the car the next morning, the investigating officer found a shoe that had been jammed under the accelerator panel. The shoe was later matched with

another shoe that petitioner had been wearing at the collision scene. When investigating officers took petitioner's statement, petitioner continued to indicate that he could not remember where he was seated in the car before the collision and whether he had been driving. Petitioner did admit to being the owner of the car.

Petitioner was charged with two counts of murder (counts 1 & 2) and two counts of gross vehicular manslaughter (counts 3 & 4.). At petitioner's trial, several of his friends reluctantly testified that they had observed him consuming alcohol and driving on the night in question. For the limited purpose of proving implied malice, the prosecution offered evidence of petitioner's role in a prior traffic collision in which one person died and another was seriously injured.

The prior incident resulted in the filing of a juvenile petition in which charges of gross vehicular manslaughter and evading an officer causing injury or death were sustained. In the prior traffic collision, petitioner was driving a "souped-up" Camero, which he sometimes drove at the Sacramento raceway. In attempting to evade a traffic stop, petitioner drove through a residential neighborhood at speeds in excess of 100 miles per hour. Several police officers joined the chase. Finally, the car became airborne and left the roadway. The two passengers in the car were ejected by the impact; one, Gale Frisbee was killed, while the other, Michael Ogier, was seriously injured.

On February 5, 1997, the jury found petitioner guilty of murder (counts 1 & 2) and acquitted him of the gross vehicular manslaughter charges (counts 3 & 4.). On August 15, 1997, the court granted petitioner's amended motion for a new trial in part and reformed the verdicts to reflect two convictions for gross vehicular manslaughter while intoxicated. On September 12, 1997, petitioner was sentenced to a term of twelve years.

Both petitioner and respondent filed notices of appeal. By opinion filed June 7, 1999, in case number C027606, the California Court of Appeal, Third Appellate District, reversed the order granting the amended notice for a new trial, rejected petitioner's contentions

challenging the murder convictions, and remanded the matter to the trial court for the reinstatement of the jury's murder verdicts and pronouncement of sentence. On March 2, 2000, after remand and despite the appellate court's explicit directive, the state trial judge granted a second motion for a new trial.

By opinion filed May 19, 2000, in case number C035081, the California Court of Appeal issued a peremptory writ of mandate which: (1) vacated the March 2, 2000 order granting a new trial; (2) denying the motion for a new trial; (3) directing pronouncement of sentence "for the offenses the jury found [petitioner] guilty of;" and (4) assigning the case to a different superior court judge. On October 6, 2000, petitioner was sentenced to a term of fifteen years to life. He appeals his underlying conviction and this sentence.

II. Standards for Granting Habeas Relief

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. See 28 U.S.C. § 2254(a). Federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See 28 U.S.C. § 2254(d) (referenced herein in as " § 2254(d)" or "AEDPA). See Ramirez v. Castro, 365 F.3d 755, 773-75 (9th Cir.2004) (Ninth Circuit affirmed lower court's grant of habeas relief under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth Amendment rights and that § 2254(d) does not preclude relief); see also Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did not address the merits of petitioner's Eighth Amendment claim). Courts are not

required to address the merits of a particular claim, but may simply deny a habeas application on the ground that relief is precluded by 28 U.S.C. § 2254(d). See Lockyer, 538 U.S. at 71 (overruling Van Tran v. Lindsey, 212 F.3d 1143, 1154-55 (9th Cir.2000) in which the Ninth Circuit required district courts to review state court decisions for error before determining whether relief is precluded by § 2254(d)).  It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d). See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different.  As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)  that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply fails to cite or fails to indicate an awareness of federal law. See Early v. Packer, 537 U.S. 3, 8 (2002).

The court will look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. See Avila v. Galaza, 297 F.3d 911, 918 (9th Cir.2002), cert. dismissed, 538 U.S. 919 (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court must perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable. See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.2003).  In other words, the court assumes the state court applied the correct law, and analyzes whether the

decision of the state court was based on an objectively unreasonable application of that law. It is appropriate to look to lower federal court decisions to determine what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law. See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir.1999).

III. Arguments and Analysis

A. Jury Instructional Error (Claims 1-5)

Petitioner claims that his right to a fair trial, arising under the Due Process Clause of the Fourteenth Amendment was compromised by erroneous jury instructions. Federal habeas courts do not grant relief, as might a state appellate court, simply because a jury instruction may have been deficient. The only question for the federal court is whether the allegedly ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. See Donnelly v. DeChristoforo, 416 U.S. 637, 642-643 (1974). A violation of due process occurs only if a trial is fundamentally unfair. See Estelle v. McGuire, 502 U.S. 62, 72-73 (1991).

1. Alternative Offenses

Petitioner's first claim is that the trial court erred in instructing the jury on the issue of alternative offenses. The trial court instructed the jury that the two charged counts of second-degree murder were alternative statements of the two additionally charged counts of gross vehicular manslaughter while intoxicated. Petitioner argues that "[g]iven that gross vehicular manslaughter while intoxicated is not a lesser included offense of murder charges and a conviction for both can be had, the trial court erred by instructing the jury that the two offenses were alternative, thereby devesting [sic] sentencing jurisdiction over a jury finding on that issue.... Petitioner was prejudiced by not having a verdict actually rendered on those counts." (Pet., pp. 6-7.) The California Court of Appeal rejected this claim noting:

> The information listed four homicide counts: counts I and II charged Erickson with second degree murder and courts III and IV charged him with gross vehicular manslaughter while under the influence of alcohol and/or drugs. Under the state of the law at the time, the two counts of gross vehicular manslaughter while intoxicated (GVMWI) were deemed lesser included offenses to the murder

charges. The prosecutor nevertheless wanted the jury to return guilty verdicts on all four counts if it found them to be proven. The defense vociferously objected. Defense counsel urged that since the two charged GVMWI charges were lesser included to the two murder counts, the court should make clear that each homicide count should be separately considered; he submitted verdict forms and instructions expressly telling the jury that each of the four possible vehicular manslaughter crimes was a lesser included offense to that of second degree murder.

> While the court did not use Erickson's verdict forms, it did instruct the jurors, pursuant to CALJIC No. 17.03, that the murder counts and the charged vehicular manslaughter counts were "made in the alternative" ; [sic] that if they found the defendant committed an act constituting one of the crimes, it was their duty to decide which one; and that "if you find the defendant guilty of one, you must find him not guilty of the other." The jurors were further informed that if they had doubt, as to whether the offenses were murder or manslaughter, they were to give the defendant the benefit of the doubt and find him guilty of manslaughter.
>
> Erickson now complains that giving CALJIC No. 17.03 was error. He claims that it was wrong to tell the jury to choose among alternative homicide counts, since the California Supreme Court has now held that GVMWI is not a lesser included offense to second degree murder.
>
> We find no error in the giving of the instruction. The holding in Sanchez does not affect the propriety of CALJIC No. 17.03 as given here. As the use note to CALJIC No. 17.03 (6th ed. 1996) at page 566 states. "This instruction is to be given where two or more counts are based on the same criminal act and the defendant is charged under alternate theories, there having been but one crime committed." [emphasis added]
>
> It is indisputable that this criterion applied in this case. Second degree murder and GVMWI were alternative verdicts based upon one criminal act of committing homicide while driving a motor vehicle. This was true regardless of whether GVMWI was a lesser included offense to murder – in other words, CALJIC No. 17.03 was applicable both before and after Sanchez. It did not mislead the jury.

(Pet. Ex. D, pp. 10-13 (internal citations omitted.)

The Court of Appeal's determination that the instruction on alternative offenses did not mislead the jury does not reflect an objectively unreasonable application of federal principles. Indeed, petitioner never asserts that the jury applied the instruction in such a way as to violate due process. Instead, his main argument appears be that had the jury been properly instructed, the jury would not have erroneously acquitted him on the gross vehicular manslaughter charges, which would have given the trial judge "original jurisdiction" to throw out the jury's verdict on the second-degree murder charges and to only sentence petitioner on the manslaughter charges. (Pet. 6-7.) Petitioner's first claim does not satisfy 28 U.S.C. § 2254(d) and verges on frivolous.

2. Unduly Coercive Jury Admonishment

In his second claim of error, petitioner claims that comments made by the trial judge, after a lone juror indicated an unwillingness to participate in the decision, were improperly coercive. Criminal defendants being tried by a jury are entitled to an uncoerced verdict from that jury. See Lowenfield v. Phelps, 484 U.S. 231, 241 (1988). A jury verdict that has been reached due to the trial judge's coercive statements to the jury denies the defendant his right to a fair trial and an impartial jury. See id. at 237. To determine whether a judge's comments were coercive, a reviewing court must evaluate them in their context and under all the circumstances. See id.

The California Court of Appeal discussed the context and circumstances of the trial judge's comments to the jury and rejected petitioner's coercions claim for the following reasons:

> After reaching and announcing that they had reached a verdict, the jury returned to the courtroom and the verdict forms were submitted to the court. Before the verdict could be read, Juror No. 2 interrupted by stating "Excuse me, Wait a minute." At this point the court, noticing that the juror "seemed to be in tears" and "manifesting [a] very emotional reaction to the presentation of the verdict," directed the bailiff to have the jury retire to the jury room to reconsider its verdict. The court then received a note from the foreman explaining that Juror No. 2 could not separate the law from her own personal feelings, and therefore "does not want to be part of the decision."
>
> The prosecutor immediately sought removal of Juror No. 2. The trial judge decided to interview her out of the presence of the other jurors. Juror No. 2 explained that although she could initially separate her personal feelings from the law, as the trial progressed "my heart...just went out to the defendant and I can't separate that." She added, "I'm not going to get up every morning knowing that I was part of this verdict." In response to the judge's inquiry, Juror No. 2 stated that she was able to discuss the evidence and exchange views with her fellow jurors, but they have told her "my feelings don't matter. We have to look at the law....I have to look at the evidence and what it proves and I can't allow my personal feelings or my emotions to intermix, and I can't separate them. I can't sit up here and give a verdict and say 'I convict.' I can't do that." Despite her request to be relieved of her duties, the court refused to discharge Juror No. 2., noting that she was able to participate in deliberations with the others and that the mere fact she disagreed with the majority was not good cause for her removal.
>
> The jury was then brought back into the courtroom. The judge announced that he had had a discussion with Juror No. 2, "and as a result of our discussion I have concluded that she is both willing and able to perform the function of a Juror...." The judge then gave these words of advice: "Now I'm aware of the fact that there may be some emotional tension which attends this process. That's not uncommon. Matter of fact, it's very common. The mere fact that there may be some feelings, perhaps some strong feelings,

about the case or some aspect of the case should not get in the way of your performance of your basic function, that being to sit down cool[ly] and calmly with all twelve of you there, discuss the evidence, discuss the instructions, see if you cannot reach some agreement as a result of this process of discussion.

> Now, in saying this to you, I don't mean to imply that I wanted you to go reach an agreement of any kind. *But I do want to emphasize what is the proper function of a juror—of every juror and that is the function or process of analyzing, discussing, accommodating the views of others and trying to reach a consensus, if that's possible, as a result of discussion.*
>
> So, I am going to ask you to return to the jury room, resume your deliberations and try to be a little tolerant of those among you who may feel some emotional tension in connection with this process. So you are now excused and asked to retire to the jury room."
>
> ....
>
> A short while later, after requesting and receiving a rereading of the court's comments quoted above, the jury returned with a unanimous verdict.
>
> Erickson argues the court's comments, especially those italicized above, were unduly coercive. He claims that since Juror No. 2 was in the spotlight as having held the minority view, the admonition to be " accommodating [to] the views of others and trying to reach a consensus" put undue pressure on Juror No. 2 to "displace her independent judgment in favor of considerations of compromise and expediency..."
>
> We disagree with Erickson's spin on the court's comments. Far from putting pressure on Juror No. 2 to agree with the majority, we read the court's remarks as an admonition to all jurors to be tolerant of differences of opinion among then and to "cool[ly] and calmly" discuss the evidence and instructions in an effort to see if agreement was possible. The fact that the court encouraged each juror to be "accommodating" to the views of others, read in the proper context, did not imply that any juror should surrender his or her independent judgment to the will of the majority, but that each juror should be tolerant of, and open to, the views of others, especially those who were emotionally involved in the deliberative process.
>
> ....
>
> Here, the court went out of its way to remind the jurors that "in saying this to you, *I don't mean to imply that I want you to reach an agreement of any kind*." Read reasonably, the court's comments represented nothing more than an effort to defuse the emotional atmosphere which had crept into the deliberations, and to urge the jurors to deliberate in a calm, collegial, and tolerant environment.
>
> Based on the foregoing, we find Erickson's allegation of jury coercion to be without merit. For the same reasons, we reject Erickson's corollary claim that the court erred in failing to give defense counsel's request for a curative instruction. Because the court's comments were entirely appropriate, there was no need to "cure" them.

(Pet, Ex. D, pp 17-20 (emphasis in original.) The state court's rejection of petitioner's claim of jury coercion does not reflect an objectively unreasonable application of the appropriate federal principles. An examination of the context of the court's statements reveals that the comments

were not coercive. For example, when interviewing Juror No. 2 outside of the presence of the other jurors, the judge stated "...I'm going to be talking with you for a few minutes. And in doing this, I want you to understand that I have no absolutely no interest in attempting to cause you to change your mind or to influence you in any way at all..." (RT 1408.) The judge did not pressure the jurors to arrive at any verdict; he assured them that he did not mean to imply that they should reach an agreement of any kind. See U.S. v. U.S. Gypsum Co., 438 U.S. 422, 461 (1978). In light of the court's repeated assurances to Juror No. 2 that she was not required to change her mind and given the context and circumstances of the comments, the court cannot find that the Court of Appeal's decision was an unreasonable application of clearly established federal law or an unreasonable determination of the facts. See Early v. Packer, 537 U.S. 123 (2002). Accordingly, the court recommends that petitioner's second claim be denied.

3. Malice and Proximate Cause (claims 3 &4)

Petitioner argues that the second-degree murder instructions given in his case[1] were: (1) insufficient to establish implied malice as well as confusing; and (2) failed to satisfactorily instruct on the requirement to establish proximate causation. He claims that the trial court should have, sua sponte, given additional instruction on probable cause.[2] The California Court of Appeal rejected this claim, noting:

///

[1]The instruction given was: CALJIC No. 8.31 which provides "Murder of the second degree is [also] the unlawful killing of a human being when: ¶ 1. The killing resulted from an intentional act, ¶ 2. The natural consequences of the act are dangerous to human life, and ¶ 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard, for human life. When the killing is the direct result of such an act, it is not necessary to prove that the defendant intended that the act would result in the death of a human being."

[2] Specifically, petitioner argues that the following instructions should have been given: (1) CALJIC No. 8.55 which provides "To constitute [murder][or][manslaughter] there must be, in addition to the death of a human being, an unlawful act which was a cause of that death;" and (2) CALJIC No. 3.40 which provides "The criminal law has its own particular way of defining cause. A cause of death is an [act][or][omission] that sets in motion a chain of events that produces as a direct, natural, and probable consequence of the [act][or][omission] the death and without which the death would not occur."

> Erickson next faults the trail court for failing, sua sponte, to give additional proximate cause instructions. He argues that the court should have augmented the homicide instructions with CALNIC Nos 8.55 and 3.40. He suggests these instructions were essential because there was evidence from which the jury could conclude that the crash (and hence the deaths of Erickson's passengers) was caused by some mechanical defect in the car, rather than Erickson's reckless driving and/or inebriation.
>
> The argument is flawed. First, CALJIC No. 8.31 as given here correctly conveyed the causation concept to the jury as it related to second degree murder. The California Supreme Court had held that this instruction, which requires that the defendant's act be "one 'whose natural consequences' are dangerous to life and that the killing be the "direct result of such an act," correctly states applicable law. Since CALJIC was sufficient to guide the jury, the omission of the more amorphous proximate cause instructions urged by Erickson cannot constitute reversible error.

(Pet., Ex. D, pp. 17-16. The Appeal Court went on to note that Erickson's argument that the "tangential ruminations of the trial judge in granting what turned out to be an invalid new trial order" were "weak support indeed for a claim of instructional error." (Id. at 16.)

The state court's rejection of petitioner's claim does not reflect an objectively unreasonable application of the appropriate federal principles. When a petitioner argues that a trial court failed to given an instruction, his burden is especially heavy because "[a]n omission or an incomplete instruction is less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977). Here, petitioner has not shown that the omission of other proximate cause instructions rendered his trial fundamentally unfair. Accordingly, the court recommends that this claim be denied.

4. Failure to Give Lesser Included Offense Instruction

Petitioners' final argument of instructional error is that the trial court erred by failing to instruct the jury that gross vehicular manslaughter while intoxicated (GVMWI) was a lesser included offense of second degree murder. As noted above, when a petitioner argues that a trial court failed to give an instruction, his burden is especially heavy because an omitted instruction "is less likely to be prejudicial than a misstatement of the law." Henderson, 431 U.S. at 155. The Court of Appeal did not expressly discuss whether petitioner's federal rights were denied by failure to instruct the jury on the lesser included offense. (Pet. Ex. D.) Petitioner's

claim was denied by the California Supreme Court without comment. (Answer, Ex. F.)

The state court's rejection of this claim does not reflect an objectively unreasonable application of the appropriate federal principles. The Ninth Circuit has held that the failure to give lesser included offense instruction in non-capital cases presents no federal question. See Windham v. Merkle, 163 F.3d 1092 (9th Cir. 1988). Accordingly, the court recommends that this claim be denied.

B. Court of Appeal's Decision Violated Due Process

Plaintiff argues that the Court of Appeal's decision which restored the jury's verdict of two counts of second-degree murder after the trial judge had reduced them to manslaughter violated his due process rights. (Pet., pp. 11-13.) Petitioner argues that the Court of Appeal abused its discretion in finding that the trial judge's decision was an abuse of his statutory discretion pursuant to California Penal Code section 1181. Petitioner points to no federal case law or constitutional provision to support his claim, but instead claims that fairness requires this court to exercise jurisdiction over his claim.

Federal habeas relief may be granted only for violations of state law and will not be granted for erroneous applications of state law. See Engle v. Issac, 456 U.S. 107, 119 (1982). Federal courts are not designed to sit as additional appellate reviewers of the judgments of state courts. See e.g., Bianchi v. Rylaarsdam, 334 F.3d 895, 898 (9th Cir. 2003)(stating that the Rooker-Feldman doctrine prohibits a federal district court from exercising subject matter jurisdiction over a suit that is a de facto appeal from a state court judgment). As a general rule, the interpretation of state law is a matter best left to the state courts. See Milton v. Wainwright, 407 U.S. 371, 377 (1972). Federal courts should follow the state court's interpretation of state law. See California v. Freeman, 488 U.S. 1311 (1989).

Petitioner's claim does not raise a federal issue; the court therefore recommends that this claim be denied.

///

      C.      Fundamental Fairness Claim

Petitioner's final argument is that "[t]he case of People v. Watson, supra, 30 Cal 3d 290, violates fundamental fairness," and, for that reason, this court should "order the State Legislature to remove the case from the manslaughter statutes and reverse Watson as a violation of several provisions of the constitutional rights to fundamental fairness at trial." (Pet., pp 13-16.) Watson held that when conduct resulting in a vehicular homicide can be characterized as a "wanton disregard for life" and the facts demonstrate a "subjective awareness of the risk created," malice may be implied within the meaning of California Penal Code section 188, and a murder charge is appropriate. People v. Watson, 30 Cal.3d 290, 298, 637 P.2d 279, 284 (Cal. 1981). Petitioner believes that his crime was more appropriately characterized as "gross vehicular manslaughter" and suggests that this court reduce his crime to such offense because the California Supreme Court's definition of implied malice is "constitutionally invalid."

As noted above, petitioner's contention that the state court erred in its application of the law does not raise a federal question. The construction of a state statute is an issue for the California state courts. A federal writ is not available for an alleged error in the interpretation or application of state law. See Estelle v. McGuire, 502 U.S. 62, 67 (1991). Accordingly, the court recommends that this claim be denied.

///
///
///
///
///
///
///
///
///

IV. Conclusion

In accordance with the above, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within ten days after being served with these findings and recommendations, petitioner may file written objections with the court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Petitioner is advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: October 19, 2006

**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE